Michael JENNER, Applicant and Appellant,

v.

Walter LEAPLEY, Warden of the South Dakota State Penitentiary, Appellee.

No. 18348.

Supreme Court of South Dakota.

Argued March 23, 1994.

Decided Aug. 31, 1994.

Steven R. Binger, Breit and Binger, Sioux Falls, for appellant.

Mark Barnett, Atty. Gen. and Craig Eichstadt, Asst. Atty. Gen., Pierre, for appellee.

HENDERSON, Justice.

### PROCEDURAL HISTORY/ISSUES

Michael Jenner was convicted on April 6, 1987, of first degree premeditated murder, conspiracy to commit murder, and accessory after the fact to murder. This Court affirmed his conviction and life sentence in *State v. Jenner*, 434 N.W.2d 76 (S.D.1988). On April 5, 1993, the habeas court denied Jenner's request for a writ of habeas corpus. Jenner appeals the following issues which we address seriatim:

I. Did the prosecutor improperly vouch for a witness' veracity and did defense counsel's failure to object constitute ineffective assistance of counsel?

II. Was Jenner denied effective assistance of counsel when his attorney failed to:

a. present testimony to explain Jenner's possession of a photo and object to the prosecutor's corresponding rebuttal argument?

b. establish that Jenner was a non-smoker?

c. properly cross-examine a State witness?

d. prevent the introduction by the co-defendant of testimony concerning the length of Jenner's prior incarcerations?

e. propose an accomplice instruction?

f. object to the prosecutor's improper summation attacking the integrity of defense counsel?

g. properly handle the filing of the Notice of Alibi?

h. object to the prosecutor's cross-examination of Jenner concerning the veracity of other witnesses' testimony?

III. Did the cumulative effect of counsel's errors deprive Jenner of his right to effective assistance of counsel?

Whereas Jenner received a fair trial with a reliable result, we conclude that his counsel's representation did not fall below the *Strickland* standard and affirm.

### FACTS

In 1984, after witnessing his cousin, Ricky Fenstermaker, fatally stab a hitchhiker on a California highway, Jackie Sjong reported the killing to the authorities. Following his arrest in 1986, Fenstermaker called a fellow member of the Vagos, an "outlaw" motorcycle club, to have Sjong "picked up."

Soon thereafter, Sjong was found dead under a bridge near Spearfish, the victim of four bullets fired at close range from two different weapons. Two months later, Vagos members Jenner and J. Richard Elliott were charged with the murder of Sjong.

Initially, the two defendants had compatible alibis during their joint trial. (The trial court denied a motion for severance.) In mid-trial, Elliott changed his defense strategy and implicated Jenner, adding that Jenner forced him to fire two more bullets into Sjong as part of a Vagos policy to involve another person in the commission of a crime to prevent that person from informing the authorities. Fenstermaker, with immunity from prosecution, provided key testimony against Jenner and Elliott. Both defendants were found guilty of first degree murder and conspiracy to commit that murder. *See State v. Jenner, supra,* for a complete discussion of these facts.

Throughout these proceedings and direct appeal, Jenner was represented by court-appointed attorney Christopher Baumann, a former public defender in Rapid City who was engaged in a private criminal law practice. Elliott was represented by separate counsel who was present throughout these proceedings. At the habeas hearing, Baumann testified that he provided competent counsel. The trial court agreed, denouncing most of Jenner's complaints as "trial tactics" which did not prevent Jenner from receiving a fair trial. We affirm.

### DECISION

In reviewing the denial of a writ of habeas corpus, we start with the presumption that an attorney is competent until a showing to the contrary is made; thus, the petitioner carries a heavy burden in establishing ineffective assistance of counsel. *United States v. Valenzuela,* 521 F.2d 414 (8th Cir.1975), *cert. denied,* 424 U.S. 916, 96 S.Ct. 1117, 47 L.Ed.2d 321 (1976); *State v. Walker,* 287 N.W.2d 705, 706 (S.D.1980). The scope of review is limited in a state habeas corpus proceeding because the remedy is in the nature of a collateral attack on a final judgment. *Gregory v. Solem,* 449 N.W.2d 827 (S.D.1989). We are not here to debate the guilt or innocence of the petitioner, but to examine his constitutional right to effective counsel. Such effective counsel, however, is not always equated with a successful result. *State v. McBride,* 296 N.W.2d 551, 554 (S.D. 1980). Further, we will not reverse the habeas court's findings unless they are clearly erroneous. *McCafferty v. Solem,* 449 N.W.2d 590, 592 (S.D.1989); *Satter v. Solem,* 422 N.W.2d 425 (S.D.1988), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989).

In *Roden v. Solem,* 431 N.W.2d 665, 667 (S.D.1988), this Court noted:

When reviewing trial counsel's performance, "it is not our function to second guess the decisions of experienced trial attorneys regarding matters of tactics." *State v. Walker,* 287 N.W.2d 705, 707 (S.D. 1980). However, the legal counsel guaranteed by the Sixth Amendment requires defense counsel to "investigate and consider possible defenses" and "other procedures" and to "exercise his good faith judgment thereon." *Crowe v. State,* 86 S.D. 264, 271, 194 N.W.2d 234, 238 (1972).

Generally, the making or failure to make motions and objections are trial decisions within the discretion of trial counsel. *State v. Anderson,* 387 N.W.2d 544 (S.D. 1986); *State v. Tchida,* 347 N.W.2d 338 (S.D.1984). This general rule will not apply, however, where trial counsel's actions cannot reasonably relate to any strategic decision and are clearly contrary to the

actions of competent counsel in similar circumstances.

■ To establish ineffective assistance of counsel, a defendant must prove both that counsel's representation fell below an objective standard of reasonableness and that such deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Luna v. Solem*, 411 N.W.2d 656 (S.D.1987). The *Strickland* analysis was further clarified last year:

> Thus, an analysis focussing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for the counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Lockhart v. Fretwell*, 506 U.S. ——, ——, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993). It is not enough for the petitioner to show that the verdict would have been different, he must show "that the counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Hopfinger v. Leapley*, 511 N.W.2d 845, 847 (S.D.1994).

### I. *Issue of improper vouching was rejected in first appeal.*

■ Prior to trial, State granted Fenstermaker immunity from prosecution for any involvement with the death of Sjong. Jenner asserts that the prosecutor improperly bolstered Fenstermaker's credibility by emphasizing the immunity agreement.

■ First, we review the purpose of habeas corpus. The remedy of post-conviction habeas corpus is restricted by the provisions of SDCL 21–27–16 and the prior decisions of this Court. As we noted in *McCafferty*, 449 N.W.2d at 591, this remedy "can be used only to review (1) whether the court had jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases, whether an incarcerated defendant has been deprived of basic constitutional rights." Habeas corpus is not a proper remedy to correct irregular procedures, rather, it reaches only jurisdictional error. *McCafferty*, 449 N.W.2d at 591; *Goodroad v. Solem*, 406 N.W.2d 141, 143 (S.D.1987). In fact, the very issue of improper bolstering was raised by Jenner's *pro se* brief on direct appeal and was summarily rejected by this Court. *Jenner*, 434 N.W.2d at 80. Hence, it shall not be considered again.

■ Acknowledging this possibility, Jenner alleges Baumann's failure to object to the bolstering at trial equates to ineffective assistance of counsel. This "failure" is based upon *State v. Goodroad*, 455 N.W.2d 591 (S.D.1990), a decision handed down three years *after* Jenner's trial. Baumann's effectiveness cannot be weighed against a standard that was not in existence or recognized in this jurisdiction. "Counsel cannot be presumed to know the rulings of this court prior to their release." *State v. Iron Shell*, 336 N.W.2d 372, 375 (S.D.1983). Nor did the trial court have South Dakota precedent to rely on concerning the claim of bolstering.

Nevertheless, we feel that it is important to revisit *State v. Goodroad* where this Court first analyzed the subject of improper bolstering/improper vouching of a witness. 455 N.W.2d at 594–95. Vouching is not strictly taboo, rather it is the prejudicial effect which must be avoided.

In *Goodroad*, an agent for the Department of Criminal Investigation testified that another witness, who had yet to testify, received a plea bargain and promised to testify truthfully. According to the agent, if the witness lied, the witness would face prosecution for "all of the drug deals he's admitted." Thus, the jury was informed that the witness had confessed to committing a crime and would now testify truthfully to avoid punishment. During his closing argument, the prosecutor stated the witness was staking his freedom on the truth with the plea agreement. We held that this was beyond prosecutorial bounds and quoted the following from *United States v. Roberts*, 618 F.2d 530, 536 (9th Cir.1980), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981):

The witness, who would otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion is that the prosecution is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation.

Conveying this message explicitly is improper vouching. *Lawn v. United States,* 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958)[.] We conclude that conveying it by implication is equally improper....

The prosecutor may not tell the jury that the government has confirmed a witness' credibility before using him. [Citation omitted.] He should be no more able to indicate that the government has taken steps to compel the witness to be truthful. Both of these arguments involve improper vouching because they invite the jury to rely on the government's assessment that the witness is testifying truthfully.

*Goodroad,* 455 N.W.2d at 594.

 However, the mere statement in such agreement that a witness promises to speak truthfully does not by itself constitute improper vouching. *Id.* A witness makes the same promise to speak truthfully by taking the oath at trial. *State v. McCord,* 505 N.W.2d 388, 394 (S.D.1993). Most jurors, even without instruction by the court, know that perjury charges will be brought if a witness makes a false statement under oath. *Goodroad,* 455 N.W.2d at 595 (citing *State v. Chakouian,* 537 A.2d 409, 412 (R.I.1988)). Thus, the State may elicit testimony on direct examination regarding a witness' immunity agreement. *United States v. Keskey,* 863 F.2d 474, 479 (7th Cir.1988). Prejudicial error does not result simply because the State uses the witness' immunity agreement to be truthful. *Goodroad,* 455 N.W.2d at 594. Rather, prejudice can result from the prosecution placing the prestige of the government behind the witness and implying that the prosecutor knows what the truth is and thereby assures its revelation. *Id.; Roberts,* 618 F.2d at 536; *United States v. Carter,* 953 F.2d 1449, 1460 (5th Cir.1992), *cert.*

*denied,* —— U.S. ——, 112 S.Ct. 2980, 119 L.Ed.2d 598 (1992). With these parameters in mind, we review the following exchange between the prosecutor and Fenstermaker concerning the immunity agreement:

Q "And in the last week, I have told you that I was going to give you immunity from prosecution in the State of South Dakota for any involvement you would have in regard to the death of Jackie Sjong. Is that correct?

A Yes.

Q I have also told you that anything that you would say here could not be used against you in any other states and other courts. Is that correct?

A Yes, it is.

Q Now, other than that offer and acceptance of immunity by yourself, are there any other deals or agreements between you and me or the State of South Dakota?

A No, there isn't.

Q All right. Now, let's get one thing on the record right off the bat. Mr. Fenstermaker, you have pled guilty—and correct me if I'm wrong—to manslaughter in regard to the death of Eric Presswood [the hitchhiker]?

A Yes. Voluntary Manslaughter.

Q All right and have you been sentenced in regard to that case?

A Yes, I have.

Q And what was your sentence?

A 12 years.

Q All right. When you entered into that agreement, was I or anybody from South Dakota a party to that agreement in any way?

A No.

Q When you entered into that agreement with the State of California, was there any discussion about leniency toward you or any offer of any deal in regard to your testimony in this case regarding Jackie Sjong?

A No there wasn't.

Q *I have advised you, have I not, Mr. Fenstermaker, that the only way that you could get in trouble testifying here*

*in this case because of the immunity that I have given you would be if you would come in and not tell the truth. Is that correct?*

A *Yes, it is.*

Q *And have I not advised you that if you lie in the courtroom that not only could you be charged with perjury, but the immunity which I have extended to you would no longer apply?*

A *Yes."* (Emphasis added.)

We repeat: It is not error for the State to elicit testimony on direct examination regarding a witness' plea or immunity agreement. *Keskey,* 863 F.2d at 479. This testimony does not insinuate the State possesses information not heard by the jury, nor can it be taken that the prosecutor has expressed his personal opinion on a witness' veracity. *United States v. Isaacs,* 493 F.2d 1124, 1165 (7th Cir.1974), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). There was no insinuation that the prosecutor knew better than the jury what the truth was. Rather, this exchange established the pressures under which Fenstermaker testified by putting his understanding of the immunity agreement, and what would happen if he breached his end of the bargain, before the jury. Such does not constitute improper vouching. *United States v. Creamer,* 555 F.2d 612, 617 (7th Cir.1977), *cert. denied,* 434 U.S. 833, 98 S.Ct. 118, 54 L.Ed.2d 93 (1977). The abuse to be guarded against is a prosecutor invoking considerations from outside the record which prejudice the defendant and deprive him of a fair trial. State's examination of Fenstermaker was permissible, *Creamer,* 555 F.2d at 617, and did not rise to the prejudicial vouching of *Goodroad.*

During closing arguments, the prosecutor discussed Fenstermaker's testimony, stating that Fenstermaker had no motive to lie, and if he did, the immunity was canceled. Although Jenner has compared these comments to the prosecutorial overkill in *Goodroad,* we remind that the State is permitted to make fair comments on the credibility of witnesses during final argument. *State v. Howard,* 323 N.W.2d 872, 874 (S.D.1982). Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, as *Lawn* teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly.

*United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985).

We do not agree that the jury, in its role of judging the credibility of witnesses, was prejudicially swayed by the prosecutor's comments. As this questioning was not improper and *Goodroad* had yet to be handed down, failure to make the objection did not fall below an objective standard of reasonableness. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 1064–65.

II. *Counsel's performance did not prejudice Jenner.*

a. Absence of justification for photograph does not constitute ineffective counsel.

When arrested, Jenner's wallet contained a "family" photograph of Fenstermaker, his ex-girlfriend, and their child. At the close of his direct examination, Fenstermaker was questioned for the first and only time about the photo:

Q Let the record reflect that I am removing the contents of a paper bag marked State's Exhibit Number 16. I am going to show you, Mr. Fenstermaker, a photograph that looks to be a family photograph inside this bag with this wallet and ask if you recognize the person in that photograph.

A Yes.

Q Who are these people?

A That's my son and my ex, Chryste.

Q When was that photograph taken?

A '84.

Q What was done with those photographs?

A Well, they were passed out to family members.

Q All right. Did you give a photograph like this to Mr. Jenner?

A No, I did not.

Q I am going to return State's Exhibit Number 1 [sic] to the plastic bag.

Fenstermaker testified that *he* did not give a copy to Jenner; yet he never said he gave a copy to Sjong. Other than police testimony that Exhibit 16 was in Jenner's possession at the time of the arrest, the preceding dialogue was the only testimony concerning the photo.

■ Jenner argues that "a reasonably prepared defense attorney [should have realized] that the prosecution would ultimately argue that the only way Jenner could have acquired the photo is if he had removed it from the victim's body." Prior to trial, Baumann contacted Fenstermaker's ex-girlfriend, Chryste Owens Fischer, about the photo and learned that she had given a copy of the photo to Jenner. Thus, Jenner had reason to possess a copy of the "family" photo. However, Baumann did not have Chryste testify nor did he question any witness as to why Jenner had possession of the photo. Tactically, there was no reason for such testimony based on the minute emphasis by the State. *Walker*, 287 N.W.2d at 707. In hindsight, the prosecution may have planted the seed; but it was not cultivated during the body of the trial.

In fact, the photo was not even mentioned during the State's initial summation. Thus, Baumann had no reason to highlight it during his closing. Nevertheless, State resurrected the topic during final rebuttal:

... I asked [Fenstermaker], "What did you do with those photographs?" "I gave them to members of our family." Jackie Sjong is his first cousin. I asked him, "Did you give any of those pictures to Mr. Jenner?" "Not to my knowledge." Yet here is Jackie Sjong found dead along side a creek. No money, no billfold, nothing in his pockets but a couple of cigarette lighters. He came all this way with nothing in his pockets but two cigarette lighters and there in Mr. Jenner's wallet is that family photograph.

■ Baumann immediately objected to this argument as "a misstatement of the facts," which the trial court correctly overruled. However, State's remarks were improper. Rebuttal is the prosecutor's opportunity to refute and resolve the questions raised in the defendant's closing argument and is generally limited to such. 75A Am. Jur.2d *Trial* § 540 (1991); *Hunter v. Kuether*, 38 Wis.2d 140, 156 N.W.2d 353 (1968). When it inferred that Jenner took the photo from the deceased's body, State went beyond the scope of Baumann's final summation. Baumann did attempt to protect his client from the improper rebuttal by objecting, but was overruled. At the habeas corpus hearing, Baumann admitted that he was aware of the rule which forbids a prosecutor from "sandbagging" or presenting new argument during final rebuttal. Thus, Jenner argues that Baumann should have objected on the ground of "sandbagging."

Despite the trial court's ruling, State made no more mention of the photo. At no time did State allege *in Perry Mason fashion* that only the killer could possess the photo. If State had made that argument, prejudice could have resulted. Although the prosecutor's tactic of presenting new argument during final argument can result in reversible error, as noted by *Bailey v. State*, 440 A.2d 997 (Del.1982), there was no prejudicial effect to the defendant here.

b. Absence of non-smoker testimony was not prejudicial.

■ Found near Sjong's body were two cigarette butts from two different types of cigarette. Forensic testing indicated that someone with the same blood type as Sjong smoked *one* of the cigarettes. Sjong had two cigarette lighters in his pockets. Elliott testified that he did not smoke. Jenner contends that he too was a non-smoker, but Baumann failed to elicit that fact during trial. In defending Jenner, Baumann should have made this point known, but Baumann admitted at the habeas hearing that he simply forgot to do so. *See Miller v. State*, 338 N.W.2d 673, 677 (S.D.1983) (an attorney is to consider possible defenses).

Although State asserted that Sjong and someone else were together under the bridge, the State did not dwell on this point

because it could not establish that Jenner did smoke. In fact, State, through forensic testing, could not prove that Jenner had anything to do with the cigarette butts. There was no evidence that the cigarette was smoked by someone accompanying Sjong. The cigarette evidence was a minor point. As the jury was never told that Jenner did smoke, Baumann's failure to show that Jenner did not smoke, per *Strickland,* did not constitute deficient performance or prejudicial error.

### c. Cross-examination of key witness was not ineffective.

■ Per SDCL 19–14–12, it is undisputed that Fenstermaker's four prior felony convictions (two for burglary, two for receiving stolen goods) could have been used to impeach Fenstermaker's testimony. Defense counsel opted not to use them. Rather, State conceded the witness' voluntary homicide conviction for killing the hitchhiker, and Baumann emphasized such. It was damning in the eyes of the jury to have Fenstermaker testify that he had killed a man for merely extending his middle finger in an obscene manner. Burglary convictions would have added little, if anything, to the impeachment defense.

Jenner cites *People v. Nickson,* 120 Mich. App. 681, 327 N.W.2d 333 (1982), where a new trial was granted when defense counsel failed to learn if the prosecution's witnesses had prior convictions. The witnesses did. A new trial based on ineffective impeachment was specifically denied: "A difference of trial tactics does not amount to ineffective assistance of counsel." *Id.* 327 N.W.2d at 335. We agree.

Baumann did not question Fenstermaker concerning his immunity agreement with the State nor his 12–year sentence for killing the hitchhiker. Jenner claims that Baumann missed a prime opportunity to prove bias. State established that it had no involvement with Fenstermaker's plea bargain in his California homicide and made the jury well aware of Fenstermaker's immunity agreement. Neither Baumann *nor counsel for co-defendant Elliott* felt it was necessary to discuss Fenstermaker's criminal activity any

further. Jenner now speculates as to how further questioning may have shown more bias. State speculates on how it could have backfired. Additionally, State did not solicit improper "opinion" testimony that Jenner and Elliott killed Sjong. Rather, fair questions in response to Baumann's questions concerning the reasons behind Sjong's death was made. Trial tactics, not errors, are being argued. *Walker,* 287 N.W.2d at 707.

### d. Testimony of prior incarcerations not improper.

■ Twice during his testimony, Elliott made a reference to the length of time Jenner spent incarcerated for prior convictions. Baumann made no objection or motion to strike the statements. Jenner asserts that Baumann's inaction resulted in deficient representation claiming that admission of these references is error.

However, Elliott was never directly, or even indirectly, asked how long Jenner had been in prison. His remarks were in response to questions concerning how well he knew Jenner and how many times had he seen or spoken to Jenner. Prosecution did not expound on his answers. Jenner relies on "authorities" where evidence of prior convictions was excluded or that held the length of incarceration cannot be used to test a defendant's credibility. His authorities are inapposite and no South Dakota authority finds such remarks to be prejudicial. Baumann did not err.

### e. Accomplice instruction not warranted.

On direct appeal, Jenner raised the issue that the trial court should have given the jury such an accomplice instruction even though Baumann did not request it. We dismissed this issue along with several others because "these assertions lack merit and affirm them on the basis of settled law, no abuse of discretion, and clearly sufficient evidence to support the determinations of the trial court." *Jenner,* 434 N.W.2d at 80.

■ The issue now before us is: was Baumann ineffective for failing to request an accomplice instruction? Settled law holds that such a determination is preferably ad-

dressed in habeas corpus proceedings, not on direct appeal, because the attorney accused of incompetence has the opportunity to explain his actions. *State v. Jett,* 474 N.W.2d 741, 743 (S.D.1991); *State v. Aliberti,* 401 N.W.2d 729, 732 (S.D.1987). Failure of a court to correctly or fully instruct the jury is not reviewable unless an objection was made or a written instruction correctly stating the law was requested. *State v. Oster,* 495 N.W.2d 305, 312 (S.D.1993). Hence, we now consider if counsel's inactions deprived Jenner of effective assistance of counsel.

The habeas court concluded that no evidence was presented at either Jenner's criminal trial or habeas proceeding to support an argument that Fenstermaker was an accomplice to Sjong's murder. We agree. Albeit, Fenstermaker had been granted immunity from prosecution; but such does *not* necessarily mean that he needed immunity because he was an accomplice, as Jenner argues. Immunity also serves to protect witnesses from statements that may be self-incriminating for other reasons. It appears that State went out of its way to distinguish Fenstermaker's actions from Jenner's criminal activities. Hence, no accomplice instruction was warranted. *McBride,* 296 N.W.2d at 554. Nor was Jenner prejudiced by its absence. *State v. Weisenstein,* 367 N.W.2d 201, 206 (S.D.1985).

f. Counsel objected to alleged improper closing argument.

During State's closing arguments, the following exchange occurred:

> State: What happened here, ladies and gentlemen, is these two defendants have taken all the facts and they've dodged them like a mine field, trying to weave them into a story. Trying to weave them into a lie that you will believe. That's what this is about. In fact, you even heard Mr. Baumann get up and ask Mr. Elliott how they had a meeting and discussed the fact that, "Didn't you tell me that you were going to say you were too drunk and that you wouldn't snitch on Mr. Jenner?" Well, see ...
>
> Baumann: Objection, your Honor. That's a misstatement of the record.

> Trial Court: Overruled.
>
> State: You see, they had this kind of a meeting. They had this idea. "Hey, we can both get out of this deal together if we stick together. We can both get out." But you know what? You've heard it said before, there is no honor among thieves. There certainly isn't honor among murderers. When it came down to it, it was each man for himself. They pointed the finger at each other and the very least, ladies and gentlemen, you can't walk out of that jury room without at least finding one of them guilty, because the evidence is there.

■ Jenner suggests that this attack on his attorney's integrity prejudiced him in the eyes of the jury and claims Baumann erred in not objecting to this "prejudice." Prior to Elliott's testimony, Baumann met with Elliott and Elliott's attorney concerning corroboration of Jenner's defense. At trial, Elliott altered his story, and Baumann impeached him on it.

During closing arguments, the government is free to draw any reasonable inferences from the evidence adduced at trial. *United States v. Richman,* 944 F.2d 323, 333 (7th Cir.1991). Nevertheless, it is not allowed to stretch those inferences into improper arguments. Baumann made his objection that State was misstating the record, but was overruled. Claims that he should have additionally argued prejudice, do not amount to ineffective representation.

g. Baumann's failure to withdraw Notice of Alibi was not error.

■ Twelve days before trial, Baumann filed a Notice of Alibi Defense listing six alibi witnesses. As the others could not be located, only one witness was ever called or subpoenaed. State noted, during cross-examination of Jenner and closing argument, Jenner's failure to call these witnesses. Jenner asserts Baumann erred in not properly objecting to State's remarks. SDCL 23A-9-6 states:

> Evidence of an intention to rely upon an alibi defense, *later withdrawn,* or of statements made in connection with such intention, is not admissible in any civil or crimi-

nal proceeding against the person who gave notice of the intention. (Emphasis added.)

State is quick to point out that such evidence is proper unless the Notice of Alibi Defense is withdrawn. Failing to withdraw the Notice permitted State to highlight Jenner's failure to provide an alibi. This seemingly indicates error by Baumann; however, had such Notice been withdrawn, State still had the opportunity to question the lack of alibi witnesses under our holding in *Waff v. Solem*, 427 N.W.2d 118, 121 (S.D.1988). Baumann's inaction did not prejudice Jenner.

h. Jenner was not prejudiced by questions concerning the testimony of other witnesses.

On three occasions during cross-examination of Jenner, State reviewed specific testimony of previous witnesses and asked Jenner if the witnesses had lied. Several jurisdictions have held such questions to be improper. *Freeman v. United States*, 495 A.2d 1183 (D.C.App.1985) (one witness may not express a view or opinion on the credibility of another witness' testimony); *Commonwealth v. Ward*, 15 Mass.App.Ct. 400, 446 N.E.2d 89 (1983); *State v. Sapps*, 295 S.C. 484, 369 S.E.2d 145 (1988); *State v. Casteneda–Perez*, 61 Wash.App. 354, 810 P.2d 74 (1991). We have steadfastly held that it is the function of the jury to resolve conflicts in the evidence, determine credibility of the witnesses, and weigh the evidence. *State v. Wall*, 481 N.W.2d 259 (S.D.1992); *State v. Huettl*, 379 N.W.2d 298 (S.D.1985). Therefore, it is improper (and probably irrelevant) for a witness to comment on the truthfulness of another's testimony, *but it is not necessarily prejudicial error*. *Ward*, 446 N.E.2d at 91; *Sapps*, 369 S.E.2d at 145; *Casteneda–Perez*, 810 P.2d at 79.

When State confronted Jenner with conflicts between his testimony and the testimony of other witnesses, State asked if each witness was lying. Twice, Jenner replied that the witness may have been "mistaken." On the third such question, Jenner indicated that co-defendant Elliott, who had contradicted Jenner's alibi and implicated him, was not truthful. There was little to be gained by these questions. Obviously, State's witnesses routinely testify contrary to the defense. Regardless, these questions in no way prejudiced Jenner nor affected the outcome of the trial. *State v. Phillips*, 489 N.W.2d 613, 617 (S.D.1992).

### III. *No cumulative error occurred.*

No error or prejudicial error exists in the numerous allegations of ineffective assistance by Baumann. There was no snowball effect of claimed errors either. *McBride*, 296 N.W.2d at 555–56.

> No two trial lawyers approach the same case from the same perspective, nor do they always develop the same trial strategy; thus, what to one appears to be sound, may to another appear unwise. A reviewing court must always be alert to distinctions between disagreement over tactic and valid complaints of inadequate counsel.

*Myrick v. Maschner*, 799 F.2d 642, 647 (10th Cir.1986). The verdict in this case is neither fundamentally unfair nor is it unreliable. *Lockhart*, 506 U.S. at ——, 113 S.Ct. at 842–43.

Affirmed.

MILLER, C.J., and WUEST and AMUNDSON, JJ., concur.

SABERS, J., concurs in result.

SABERS, Justice (concurring in result).

I concur in result but I do not accept the majority's position that defense counsel's performance was adequate. I think it was deficient in several respects, including the failure to object when the State was improperly bolstering the credibility of its witnesses, the failure to adequately prepare in reference to the photograph and failure to use the fact that his client was a non-smoker. Even the treatment of Jenner's prior incarcerations was questionable. Defense counsel's cross-examination of the State's key witness Fenstermaker was simply inadequate. Fenstermaker was clearly an accomplice entitling the defense to instructions on accomplice testimony. How the majority opinion can assert that Fenstermaker was not an accomplice is beyond me, especially when, under his own

testimony, he was involved in plotting the murder.

However, under *Strickland v. Washington,* the defendant must also show that counsel's deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *Lockhart v. Fretwell,* 506 U.S. ——, ——, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993). I am not convinced that the second prong of the *Strickland v. Washington* test has been satisfied and, therefore, I concur in result.